Case number 153597 Teresa Green v. Central Ohio Transit Authority. Oral argument not to exceed 15 minutes per side. Mr. Marcus Ross for the appellant. Good morning your honors. Marcus Ross on behalf of appellant Miss Teresa Green. We reserve three minutes for rebuttal. Brief recitation of the facts as the court is fully aware in this cause. Miss Green was employed with the Central Ohio Transit Authority for 19 years of distinguished service. Never received any progressive discipline or discipline for any a time card theft or attendance issues. She also received all of her performance merit pay increases during her entire 19 years of service at the Transit Authority before she was abruptly terminated on or about September the 8th of 2011. The first assignment of error that we'd like to raise before this branch of the court is that the trial court committed reversible error based on the fact that the trial court did not weigh the evidence in the record in the light most favorable to the non-moving party. Miss Green in determining whether or not the primary facing case for retaliation was in fact met. Now Pelley in their brief has already indicated that they will stipulate that the first three prongs of the inquiry for the primary facing case have been met. The first three elements have been met. The only issue before this court is whether the there's a causal connection between Miss Green engaging in protected activity and her subsequent termination, i.e. the adverse employment action by Pelley has been met. We will submit and we refer to, I'd like to invite the court specifically to direct evidence in the record, page ID number 676, plaintiff's exhibit 61, which reflects a detailed account from an anonymous caller at the Transit Authority who details Vincent Zeno's treatment of Miss Green in retaliation for the discrimination complaint that's pending against John Hancock, Miss Green's direct report. It specifically states, quote, somebody needs to talk to Vincent Zeno. He comes back here and he talks to us about Teresa and it is so sad. She hasn't done anything to him and he is bound and determined to pay her back to help John. That's clear retaliation based on the fact that there is a pending civil rights complaint that's been filed against John Hancock, Mr. Zeno's counterpart and colleague, long-standing counterpart and colleague that's pending. He goes on to state, she didn't do anything to John. He degrades her to us. When she was out sick with pneumonia, he told us the reason why he didn't have any work was that Teresa didn't come to work and didn't do her work. We are so tired of hearing him talking about her. They're going to put that girl in a mental hospital. If she ever gets a case, we are all testifying on her behalf because we see she doesn't bother anybody. She sits down. She doesn't even get to take a lunch. She doesn't even get to go outside and get some clean air. Now the court below did not weigh this evidence in the light most favorable to the non-moving party, if at all. That's reflected in the court's opinion. Furthermore, now that the prima facie case has been met based on the evidence and the record, then of course the burden shift under the burden shifting framework to appellee to show that there was a legitimate non-discriminatory purpose for Ms. Greene's termination. We would submit that nothing in the trial court below reflects any evidence of any legitimate purpose for the discrimination. Specifically, the time cards that were used, the time card reader report that was used as basis by Tim Smith, the director of facilities to terminate Ms. Greene. I'm struggling with the articulation of her time schedule. In some places in your brief it's referred to as 7.15 to 4. Other places 7.15 to 3.15. They appeared to look at 7 o'clock as the time. Was there a set time schedule? We can make the argument, Judge, that's a genuine issue of material fact, but there's an email reflected in the record below where Ms. Greene asked John Hancock what her schedule would be. It's 7.15 to 3.15, which was the eight hours. As a matter of fact, the anonymous caller reflected in the transcript says she didn't get a chance to take a lunch. So she worked an eight-hour day, clearly reflected in the record. But Mr. Hancock did give her time to adjust her schedule, as did Tim Smith, his predecessor. And they have a flexible hours policy at the transit authority that's documented in the record. Once again, as... Is there a dispute of fact here as to whether she was violating these time schedules? I think that's what actually her schedule happened to be, and whether she was being treated discriminatorily with regard to that, if she was keeping this schedule or doing what she was told, then I guess the inference you would be arguing for is that the mistreatment amounted to discriminatory, was based on discriminatory animus or something. We would make the argument that the genuine issue of material fact is whether Ms. Greene was stealing time from her employer. Based on the fact that this time card reader report, we don't know what it shows. It shows that she clocked in at certain times, but it doesn't show when she clocked out. And if you juxtapose that with the actual time cards themselves in the record, which have a designation of the Central Ohio Transit Authority, shows that time was extracted for processing through the electronic timekeeping system. Did you raise that issue specifically to the district court? Oh, yeah. That's reflected. Did you raise the comparison of the time cards to the district court? Well, that's, once again, we believe a jury question when you compare and compare as relates to the actual, to answer your question, I don't know that the evidence in the record below reflects an actual comparable, and we're not drawing a comparison, contrast between the two, but we think it's a jury question as to weighing the evidence reflected in the actual time cards themselves versus the actual reader report, because there's no correlation. In the time card itself that was submitted into the record, that was approved up the chain of command, your honors, by John Hancock and Vincent Zeno, because they testified to that. It was approved up the chain of command. The time was extracted, okay, and it shows sick time, holiday time, and vacation time, and we would submit that a reasonable jury has to weigh that evidence against the reader report that Mr. Smith uses based on the term name is green to see which one of them is an authentic document. The payroll clerk or the custodian of the record has to weigh that evidence in a jury. That's a reasonable jury question. That's a genuine issue of material fact. Well, there's a genuine dispute factually as to the keeping of the time records and whether your client was in violation or not. Using the McDonnell-Douglas burden shifting, how do we go from that to determining whether the record was discriminatory? Pretextual. Yes, your honor. Well, as the court is well aware, on or about August the 22nd of 2011, Mr. John Hancock received a letter from Marion White reflecting that if there's a finding of probable cause for discrimination based on the civil rights complaint Ms. Green has filed, that his employment status is at issue. Coupled with the fact that if you recall, and that's page ID number 817, I'd invite the court to see Plaintiff's Exhibit 5, which is the same document, that the letter from Marion White reflects, in fact, that Mr. John Hancock has had a history of issues with the transitory... So the people you allege retaliated against Ms. Green are Mr. Hancock and who else? Mr. Smith and Mr. Veneman. We would submit to the court... None of those people had anything to do with her termination, correct? Mr. Smith is the individual who unilaterally terminated Ms. Green. And as I was referencing, your honor, in this document, Mr. Smith was aware of the fact... Is he aware... Even if Mr. Smith was the individual who retaliated against her, who terminated her, is any of the conduct she alleges on the part of Mr. Smith's not involved in that? He's only involved in terminating her? He's involved in terminating... He was a part of this so called investigation, which we believe was pretextual in nature. If you reflect on... Or I like to... I thought it was Treadway, Curtis Stitt, and Marion White who agreed to the... Who made the decision about termination. No, they met with Tim Smith on or about August the 18th, based on this so called investigation that he and or Aaron Tompkins were conducting. Okay. And then... And this is a very dispositive fact. I'm fine. This is a genuine issue of material fact. Mr. Smith goes from... When they get together and agree to a three day suspension of Mrs. Green to an actual termination. I got who Smith is. Yeah, to an actual termination. And keep in mind, Tim Smith has had a long standing relationship with John Hancock, who's got the pending civil rights complaint filed by Mrs. Green against him. He's given John Hancock multiple opportunities. He's given him two suspensions. He's given him a final warning letter. He's been clearly in the record covering for him throughout his tenure. So clearly the motivation for this alleged investigation is to prevent Mr. Hancock from losing his employment if there's a finding of probable cause. If you see in the record, this investigation ramps up on or about after August the 22nd when Mr. Hancock receives this letter. On August the 23rd, Tim Smith, as reflected in his affidavit, meets with Mrs. Green. He doesn't bring anything up about this alleged time card theft. He says in his affidavit that this is a performance evaluation, but he doesn't discuss any performance of discipline. Think about that. That's circumstantial. That clearly shows pretext. Also, the record clearly reflects that Aaron Tompkins indicates in his so called memorandum of this investigation that he was made aware, because this is where we're talking about the employment, he was made aware, your honors, by these two managers. Mrs. Green was not at her desk. She wasn't working an eight-hour day. Now, keep in mind, Mrs. Green is facilities coordinator. She's mail clerk. And she also serves as receptionist. She could have been away from her desk for any number of reasons. That means that she's stealing time. Not to mention, from a pretextual standpoint, we still to this day do not even know who these alleged managers are that claim Mrs. Green was not at her desk or was stealing time. That's a genuine issue of material fact for a jury to determine. Who are these individuals? In order to make that dispute a fact, wouldn't you need to have deposed Aaron Tompkins? Mr. Tompkins? And I've anticipated that, your honor. We felt like there was sufficient evidence in the record to survive summary judgment based on Tim Smith's statements about the fact that he conducted the investigation. And there was clear pretext in this so-called investigation. And we do have him listed as a witness that we will call Mr. Tompkins during the course of the trial. The court grants our request to reverse summary judgment and remand this case to the United States District Court. Your client did not offer any evidence in connection with the summary judgment motion that she was, in fact, on time for work, did she? Well, there's evidence in the record that reflects she worked an eight-hour day based on... Supposed to work an eight-hour day. But where is the evidence that she submitted that she did, in fact, work an eight-hour day, and that somehow the information on which the decision makers relied was erroneous? We would submit to the record... Submit, your honor, that there is evidence in the record that's been submitted by the appellant in the form of the time cards themselves. Because the time cards are genuine, authentic documents that are certified. You said they don't show what times she checked out? They show eight hours that she worked during the course of the day. They were approved from 2010 all the way through 2011 when this so-called investigation was taking place. Well, is that a figure she submits? Okay, to explain to you how this process works, okay, from a time card standpoint, Ms. Green inputs information to the electronic time card system. Then it goes up the chain of command to, this is Mr. John Hancock, then it goes up the chain of command to Tim Smith, who's the director of facilities, who then, in fact, submits it to the payroll department. There's email correspondence reflecting that Tim Smith was approving everyone in the department's time cards, including Ms. Green. They don't show... They show eight hours. They don't show a checkout time? It just shows eight hours. She's filling in the time cards, but then they're looked at by John Hancock and then Tim Smith. But there's nothing like testimony from her or an affidavit that, in fact, she was there on time. Is that right or wrong? Well, there's evidence in the record based on email correspondence as to when she checked in during the course of the day. 7-15, 3-15 were her hours. There's an email correspondence reflecting that she sent that email to John Hancock. He said, 7-15, 3-15 is fine. She worked eight hours, okay, and that was a requirement, to work eight hours with Mr. Hancock. And that's... Did she input that or is she supposed to be inputting when she leaves or is the eight hours what she's supposed to be working, but she's not inputting that every day she works eight hours? Yeah, she puts that information... How do we know that? How do we know whether or not... What's the testimony about that in the record? Well, she... In her sworn deposition, she talks about the number of hours that she worked on a daily basis. And once again, the evidence in the record clearly reflects that all of her time cards were approved by the same individual. Can you refer us to the place... You don't have to find it now, but the place in her deposition where she tells us that the charge that she was late was false? That the charge that she was late was false? Yeah, that she was in fact there on time, working her eight hours every day. Okay, well, I would submit that that is reflected in the record based on her... I don't know the specific... She doesn't tell us that. The inference we have to draw is from the time cards. From the time cards and  the testimony about how that worked came from her? Yes. Matter of fact, there should be evidence in the record that Ms. Green actually worked as a payroll administrator herself for other individuals, not in the Facilities Department, where she actually inputted time card information for those individuals at CODA that worked within her in that particular department that were non unionized administrative employees. So she knew the process herself. So to allege that she's engaging in fraud and submitting time cards for hours that she didn't work, that's clearly pretextual. So you're saying that, and correct me if I'm wrong in response to Judge Givens, that in her deposition testimony, she testifies that she worked the required amount of hours. Yeah. That's clearly set out in her deposition testimony. Is that so or not? You're asking me to recall that specific fact, Your Honor? I can't say with any degree of certainty, but I think the genuine issue of material fact for a jury is, in fact, whether or not Ms. Green worked the required eight hours. You don't remember whether in her deposition testimony she testified that she was... That she did not commit the infraction she was... Oh, yeah. She stated that throughout the record. You told me she didn't. That's what I'm asking you. That's all I'm asking you. My independent recollection, Your Honor, to the best of my independent recollection, is that Mrs. Green testified that she worked an eight hour day. Well... That's what I was asking you. Okay. So I apologize for the confusion, Your Honor. She worked an eight hour... She worked an eight hour day or her schedule, she was scheduled for 715 to 315. She was scheduled from 715 to 315 during the period of time that she was working with John Hancock. She had different arrangements with Tim Smith, the overall director of facilities. It's a little odd to me that she would rely on timecards and never personally contest the allegation that had been made against her. Now, whether that has anything to do ultimately with the disposition of this case, I'm not sure, but it just seemed that if you did, in fact, deny the allegation, that you would, in fact, have explicitly contested it in your deposition. But more likely, human nature would be that if they fired you and the stated reason was your chronic lateness or your chronic failure to work eight hours, that the natural thing would have been at that point to bring it up with your deposition. So, please give me an opportunity to disprove these horrible false allegations. Okay. And I don't know that that question was ever posed to Mrs. Green necessarily in her deposition, but I would submit to the court that the evidence in the record below reflects that she worked from 715 to 315. And that's because that's what the timecards show. Well, that's what's reflected in the email correspondence between her and John Hancock based on the fact that the time was extracted from the timecards. John Hancock wasn't even there during the time the investigation was being conducted, was he? Okay. He was on FMLA leave of absence. But the question becomes whether or not a reasonable jury can draw an inference that he's having communications with Ben Zeno based on the fact this anonymous caller says this is payback for John. No, no. I'm really confused by your argument. I thought you said a few minutes ago that she testified that she did work the required number of hours. And now you're saying that it's only shown through the time records that were presented at a deposition. Did she testify that she worked the required number of hours or not? My understanding, Your Honor, I would say yes in the affirmative. Okay. Well, then that's your answer. You're understanding. Yeah, I that's what you're saying. Correct. I would say in the affirmative, Your Honor, that in fact she worked in an eight hour schedule. Maybe I didn't ask you. She worked it. I asked you. She testified to that effect in their deposition. My recollection would be in the affirmative, Your Honor. Maybe you can find if you have anything with you that would confirm that. Maybe you could tell us the exact place in the deposition to look on your rebuttal. Okay. All right. Thank you. Thank you. Good morning. Good morning. May it please the court. Shannon Harris of Squire Patent Boggs on behalf of the defendant, Apple East Central Ohio Transit Authority. All right. You may proceed. Thank you. This court should affirm the district court's decision granting Coda's motion for summary judgment on plaintiff's retaliation claim. As the district court correctly found, there is no evidence that Coda retaliated against Ms. Green because she filed a charge of discrimination. The undisputed evidence shows that Coda terminated her employment because she falsified her time cards, a violation of the public... Do you represent your client at the plaintiff's deposition? Me personally? No. It was another member of my firm. Do you have a deposition transcript of the plaintiff? I do. And I can actually address the questions you were just asking of appellant's counsel, if you would like. Yes. Why don't you do that? Okay. Yes. So, in Ms. Green's deposition on page ID 2511, she's asked, regarding the time cards that show the eight submitted, and her answer was yes. And she also answered affirmatively that when she was asked, these are where you put the hours you actually worked, and she testified yes. So, I mean, we think that the only potential... And what was the report drawn from that said that that was incorrect or untrue? Okay. So, the exhibit that she was testifying regarding that I was her plaintiff's exhibit 36, which is the cyborg time records, which is where the employees would input their time and where appellant discussed about the supervisory approval, which we believe the district court correctly analyzed, has nothing to do with it. They weren't there to witness her coming and going. But the investigation relied on, among other things, but based on the investigation report, relied on her submission of time for those days, a time card reader that is swiped when employees enter the building, as well as security footage, which we have in the record in the form of photographs showing her entering and leaving the building. In the record, we have those from the June time period. And is there one of those time stamps or time indicators on the photos? Yes, there is, Your Honor. And in fact, on two of those photos, a plaintiff admits that it's her on there leaving early. And we would submit that... There's a dispute as to what constitutes early, what constitutes late. Her hours that she was supposed to report or could leave changed several times in the course of her employment. Did you... Or when I say you, your client, did they do an accounting or an audit to figure out, all along the way during all the time of her employment, whether she put in the requisite time on all the days covered by the time period that's in dispute? Well, so the short answer is, we don't know because it's not in the record. Mr. Tompkins wasn't deposed and asked as to exactly what he looked at in his investigation. The other individuals who reviewed and vetted the investigation results, Mr. Smith, Ms. Treadway, who's the Vice President of HR, and Ms. Graham, who's the Director of HR, were not asked those details at their deposition. However, the actual hours or her start time and end time are irrelevant because the investigation presumed that she didn't take a lunch and was just looking at whether she was there for eight hours a day, regardless of whether she started at 7 or 7.30. Of course, your client had the opportunity to present that information to the court in connection with the motion for summary judgment. Did they present the information in connection with, to the court in connection with the motion for summary judgment? I'm sorry, which information? About the time records in terms of any review or compilation or audit of the time records to ascertain that she did or did not commit these time infractions. Yes. Well, we submit the underlying time records is... We presented evidence that COTA relied on the investigation, which found that she falsified her time records in making the decision to terminate her employment. Now, the district court did correctly find and we... COTA, you're saying you relied on the investigation that she committed, a violation of the time records, but the time records themselves are irrelevant to making that determination? How could you say that? Well, because it's plaintiff's burden to come up with evidence that our submitted reason, our legitimate reason for termination is false, and she did not present any evidence that. Despite that fact, however, we did present evidence that she was in fact... She did not dispute that it was her in those security footage, photographs. But she claimed that she did not commit the infraction, and then under the burden shifting and determining whether the proposed termination was pretextual, then the company would have to offer, presumably would offer some evidence to the contrary. And you're telling me they didn't do that, although they had these tapes of when she left and all that. We did offer evidence that she does not dispute that it's her in those video cameras, and there is record evidence that in two specific... Okay, she might have been in the cameras, but did you do the appropriate calculation to see that she wasn't putting in the requisite time? There's this information in the record that the time changed, she was told she could leave at seven, then she was told it was 7.15. How late she had to stay was at one point in time during part of her employment, then it changed. There was more than one supervisor that she was getting permission as to her comings and goings, and all that could easily result in some disputed factual issues. So I'm trying to find out how did the review look at all this information and make certain, other than her admitting that that's her in the... Okay, aside from admitting that it was her in... Not disputing that it was her in all the photos, she specifically admits that two of the photos show her leaving early. And when you compare the time swipe and or the video of showing her entering the building, and then the video of her leaving the building, it shows just in June, I think it was 13 occasions on which she did not work a full hour, eight hour day, but she submitted eight hours on her time card. And of those, at least... I understand when you're giving your business reason for why she was discharged, what did you submit? Let's... We've got... Let's say the time cards you say are not at issue, because they're falsified. Alright. And what did you submit to show that they were false? The investigation report from Mr. Tompkins and... Photos. Pardon me? Were the photos a part of the record on summary judgment? Yes, they are, Your Honor. For the June timeframe, just... Yeah, we have the understanding... Again, it's not in the record, it was not... Mr. Tompkins was never deposed. Whether... I believe he looked at photographs from earlier time periods, but the June time period is in the record, and that is what the testimony is... The way I read the report, he indicated that he had examined from May to August, and he focused on June, because that seemed to be the most egregious month. Is that right? And he didn't look further as to June, and did these photos, and so on, and so forth. That's my understanding, Your Honor. So he initially... Well, is that what he said in his report? That's what he said. It's... Everybody keeps telling us what their understanding is. What their understanding is. We wanna know what it is, not what you understand. That is what he said in his report, but we also have testimony that he submitted his report and met with Mr. Green, Ms. Treadway, and Ms. Graham on August 24th, and they actually asked him for additional information, because they wanted to make sure that June wasn't an outlier, an aberration. He actually went back and took a closer look, and they met again six days later. And there's the testimony in the record from these individuals that they met again, and then based on that, determined that she had, in fact, been regularly falsifying time records, and that was the reason for the termination. That was an oral report. That was not a written document. That's my understanding, correct. Alright. Well, what else do you have to say on behalf of your client's position? So I would like to address one issue that the appellant raised, which was with respect to the anonymous complaint, Plaintiff's Exhibit 61. Appellant's counsel alleged that that was a report made by coworkers about Vince Zeno. First of all, those complaints are hearsay, and they were never authenticated, so they should not be admissible. But regardless, Mr. Zeno testified that he had never seen these records before, and the evidence shows that just prior to these complaints being made from these anonymous other employees, Mr. Zeno had actually counseled and managed plaintiff regarding two complaints he had had about her not being at her desk. And that email documenting that counseling is in the record and shows that he was just alerting her that these two supervisors had mentioned that she would, in fact, be hearsay, because they wouldn't be offered, for the truth of the matter asserted, they would instead be offered to show the basis of which your client acted. I mean, they're actually helpful to you, probably. Oh, yes. No, the reports of this... And I wouldn't go around arguing that they're hearsay, because they aren't. No, I totally agree. The reports of the supervisors are not hearsay. I'm saying that the anonymous complaints that appellant's counsel referenced at Plaintiff's Exhibit 61, at the beginning of his argument, are hearsay and were not authenticated. They appear to be anonymous... What is this that was not authenticated? It's two anonymous complaints that were apparently submitted to a hotline complaining about a supervisor that is identified as Vanseno, V-A-N-S-E-N-O. Nobody ever authenticated those documents, and they're clearly hearsay. Nobody knows who said them, and they cannot be taken for that reason. Well, but if they're not admitted, it doesn't matter if they would have been admissible. I mean... True, true. But there's two individual cases. I wish that was just the trial judge and me reacting to what you said. The other issue that I wanted to address was... Before you move from the supervisory complaint, it appears in the record that there was a motion to that it was resolved by an agreement that the director of HR would provide the information in her deposition. Is that correct? That's my understanding. And then she did... Her deposition indicated that she didn't remember. I'm struggling with how someone could offer a witness as providing an answer to a question in a motion to compel, and then have that witness come forward and testify that I don't remember the answer to that question. I can understand the concern. I'm not exactly familiar with exactly the question that she was supposed to be answering at the deposition. Who were the two supervisors who reported that she was not at her desk when she was supposed to be? So, yeah, that information would be within Mr. Tompkins' knowledge, and he was no longer an employee of CODA at the time of discovery. But you had an agreement with him, didn't you, when he left, that in exchange for a severance package, he would be available to testify in this litigation. He was never... We were never given a notice of deposition for him. He was never... We were never requested to produce him for deposition, and there was never a subpoena issued from his testimony. You put nothing in the record from him to help your case either, to show that there were other complaints. Correct. There is no evidence as to who these anonymous supervisors were. However, Mr. Hancock had been on medical leave for two months at the time that this investigation was initiated and that these two supervisors complained, and Mr. Hancock testified that he did not talk to anybody. He did not know about this investigation until after Ms. Green's employment was terminated. Mr. Zeno, who was also dragged into this, testified that he was never aware that Plaintiff had ever filed a charge of retaliation until his deposition. So that takes out both Hancock and Zeno as being those two supervisors. And we would submit that the identity of those two supervisors is irrelevant. There is no... Mr. Smith conducted the investigation based on Mr. Tompkins telling him that he'd had complaints that Plaintiff was coming into work late or not at her desk. And Mr. Tompkins' report to him came just one week after Mr. Zeno had emailed Mr. Smith alerting him that Mr. Zeno had had complaints from two supervisors, Mr. Randy Rosser and Mr. Skip Thomason, that Plaintiff was not at her desk. So Mr. Smith at that point decided to authorize Mr. Tompkins to look into it further. And when Mr. Tompkins started looking, he started to see, and you can tell from his investigation, he says he looked and then he noticed that there were times showing her arriving late and then he looked deeper and we have his investigation report. So our position is that the identity of the two supervisors is irrelevant. There's nothing in the record indicating that the two supervisors that complained to Mr. Tompkins had any discriminatory animus or retaliatory motive. The only evidence in the record is, in fact, that it wasn't Mr. Hancock and it wasn't Mr. Zeno. And those are the only two people that Plaintiff has alleged that she had any problem with. I see that your red light is on, so you might want to back up. Thank you, Your Honor. This is a very quick question. I was looking at the district court docket sheet and you filed a whole bunch of stuff in support of the motion for summary judgment. It appears you filed virtually every deposition that was taken in the case. The plaintiff, as I read the docket sheet, submitted a memorandum but did not submit any additional evidence in opposition to summary judgment. Is that right? I believe that the plaintiff may have submitted the deposition of Mr. Zeno. I don't have the docket sheet in front of me as far as whether there was anything additional submitted after the... I'm not seeing anything. It may be 37. I can... Did you submit Mr. Zeno's deposition? I believe it was the plaintiff, but I would have to check. Someone submitted an additional position. I'm sorry. Yes. But to your knowledge, nothing was submitted bringing a comparison of the time cards. That was not an issue raised at the summary judgment. You mean like the backup for the investigation results showing the comparison? Yes. The plaintiff taking the time cards and making a physical argument, look at the time card. Oh. This doesn't work. We work... The eight hours were worked. Correct. There was no level of detail below. I think that the most detail that came was in the principal brief before this court. In conclusion, I would just like to say that summary judgment is proper because there is adequate time and opportunity to conduct discovery. Ms. Green had the burden and failed to present facts to support the essential elements of her case. Belief, conjecture, and conclusory allegations are not sufficient on summary judgment. I know you're lifelong and all that, but what about the proximity and time to the EEOC complaints and the disciplinary action taken? Should we... To what extent should we take that into account here in deciding if there's actionable retaliation? Your honor, you should not take that into account. The charge of discrimination was filed in February of 2012. Ms. Green's employment was not terminated until September, a full seven months later. So we would submit that the temporal proximity is not sufficient in this case, even for the purpose of the prima facie case. There were two charges, correct? Yes. Her first charge was filed in 2011. Okay. Oh, sorry. Yeah. And then she filed the charge alleging the discrimination against Mr. Hancock in February. And so it would have been at least six months, if not more, prior to the termination decision. And it was not... It's the time period, the relevant period is not from when Mr. Hancock learned about the filing of those charges on August 22nd. What about the June 11 second discrimination charge? She did file another charge in June. That charge was withdrawn, but the knowledge of her filing the charges was there as of February. So we would submit that that would be the relevant time period to look at for temporal proximity, and that's very distant from the termination decision. The district court correctly found that the evidence shows plaintiff was terminated for falsifying time cards. There's no evidence to the contrary, so this court should affirm the district court's decision, granting CODA's motion for summary judgment. Thank you very much. Thank you. Any rebuttal? Yes, Your Honor. There's clear factual dispute that we'd like to raise for the court. Made some notes here. You asked the question, Justice Clay, about the temporal proximity. Judge Clay, you're giving me a promotion. The relevant time period is the time period two weeks from when John Hancock received the letter from Marian White, reflecting that there's a possibility he's about to lose his job, but there's a probable cause to determination of discrimination. Two weeks after that, on or about September the 8th, is when Ms. Green was terminated. That's the relevant time. But it wasn't the investigation going while Hancock was on FMLA? The investigation was going within the time frame of August. Now, that's a factual dispute as to when the investigation began, Your Honor. Tim Smith says in his affidavit, and he's very vague, as to when, sometime in August, this investigation began. Once again, that lends itself to the argument that there's a credibility issue with Mr. Tim Smith, and credibility as to whether this overall investigation is pretextual in nature. In rebuttal to counsel's discussions about whether or not Ms. Green admitted in her deposition transcript that the video surveillance, video images are her, they pulled one portion of her transcript testimony. If you look at her deposition transcript testimony in its entirety, she goes back and says she's inconclusive as to whether the video images clearly reflect that it's her. And that's a genuine issue of material fact for a jury to determine whether or not the individual depicted in those images is, in fact, Ms. Green. That's a genuine issue of material fact. Help me understand, if it's your burden to show retaliatory animus, because that was all that was... That was the only claim left, right? Yes. And your position is that it must have been Zeno and Hancock? Correct. I understand the frustration on trying to make this happen through a motion to compel, but why didn't you depose Tompkins in asking the question? And I'm not sure about the motion to compel, Your Honor. Well, you did an earlier motion to compel. We did an earlier motion to compel to get emails, Your Honor. That's reflecting the record, reflecting that Ms. Green's time cards were approved. Okay, so you got those, then the only question was your claim that Hancock and Zeno were retaliating. Yes. And that's the key to your case, the retaliatory motivation, but you did not depose Tompkins in asking who the supervisors were. No. And once again, that was because based on the evidence that was in the record, Your Honor, we felt like we were gonna survive some re judgment and we're gonna have him subpoenaed for trial, but the... What is your best evidence of retaliatory motive? The direct evidence in the record from the anonymous quota hotline that Pelley would have you believe this hearsay evidence, that was identified to address her issue in the record, that was identified that this individual had direct eyewitness testimony of retaliation by Vince Zeno based on the fact that there was a pending civil rights complaint, okay? Pending, and that Mr. Hancock would lose his job specifically based on that letter that he received from Mary... I'm not seeing... I mean, the Defendant's Council thought you filed the deposition of Zeno. I'm not seeing that on the... It's in the record. Yeah, it's in the record. It's in the record, Your Honor. Okay. Yeah, it's in the record. I'd like to also address... You were asked to see if you could identify or locate in your client's deposition transcript where she was talking and saying... Making statements to the effect that she had not committed any infractions in terms of submitting the time or not working the appropriate time. Did you find anything like that? Well, the termination meeting on about September 8th of 2011, Ms. Green categorically denied. The termination meeting was Tim Smith categorically denied that, in fact, she had committed any time card fraction. I think opposing counsel addressed the issue as to whether that question was posited to her in her deposition. Okay, but she denied it and you're saying that's in her deposition transcript. Are you saying that or not? I'm not sure I'm understanding your question, Your Honor. You said she denied it. Where is that denial in the record? Is it in her deposition transcript or somewhere else? That she denied... Yes. That she committed these time infractions. Well, I don't... And I just consulted my client with that, Your Honor. I don't know that that question was ever posited to my client in the deposition. I didn't ask you if that question was submitted to her. I asked you if she ever... If the record reflects anywhere that she ever denied it in the record. I don't know that there's anything in the record that she denied any time card allegation, but I don't know that the question was ever posited to her within that context as to whether or not she's denying these allegations of time card theft. You can't respond to a question that you're not... When the deposition is filed and there's no indication that she's denying the violation, and when the defendant files that, it has significance and you're... One can argue that you were then obligated to come forward with the evidence that would create a genuine issue of fact as to her denial. And you didn't do that, right? I don't recall. So you're stuck with whatever the deposition reflects if we go back... You didn't file an affidavit, excuse me. No, we didn't file an affidavit for Ms. Green, Your Honor. We just rely on whatever was reflected in her deposition testimony as to her time that she worked, as to the amount of hours that she worked from 715 to 315. We'll rely on that for the purposes of today's argument. The other issues I'd like to raise was once again, the anonymous caller hotline transcript was identified in the record, okay? It was identified in the record. That's reflected below. And this time card investigation was in fact conducted by Tim Smith. Now, apparently raises the issue about Aaron Tompkins versus Tim Smith as relates to the investigation. And the credibility of those two individuals is a genuine issue of material fact that we think should allow a jury to hear this issue. From the vantage point of Tim Smith and his sworn affidavit indicates that this investigation was initiated by two managers and we still don't know their identity. And Tim Smith also says that he began to oversee the investigation. You might want to wrap up. Your mic's been on there for a while, so... Yeah, there's no testimony in the record, Your Honor, of the meeting... The meeting with the Human Resources Department was Tim Smith meeting with the individuals in the Human Resources Department, okay? His affidavit reflects that. That's... That doesn't sound like wrapping up to me. Okay. No, you're still arguing. And I apologize, Your Honor. Wrapping up is saying what you asked, what relief you're asking for and having... We believe... Hold on. Hold on. Stop. Wrapping up is saying what relief you're asking for and have a good day. That's what's happening. You're absolutely right, Your Honor. My apologies to the court. We believe that there's genuine issues of material fact in this case, as reflected in the evidence that's been admitted into the record. The prima facie case for retaliation has clearly been met. That was an issue that was raised at the trial court level in the court, in the summary judgment motion that was granted as to whether or not there's a genuine issue of material fact and whether or not the prima facie case was met. We clearly... Alright, alright. Indicate that it was met. Thank you, Your Honor. We're done. The case is submitted.